IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JASON A. FARMER                                                                                       PETITIONER

v.                                       Civil No. 5:20-cv-05088

DEXTER PAYNE, Director,
Arkansas Division of Correction                                                             RESPONDENT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Before the Court is the *pro se* Motion under 28 U.S.C. § 2254 to Vacate, Set Aside, or Correct Sentence (ECF No. 1) filed by Petitioner Jason A. Farmer ("Farmer"). Arkansas Division of Correction ("ADC") Director Dexter Payne ("the State") filed a Response (ECF No. 8). Farmer filed a Reply (ECF No 13). The matter is before the undersigned for issuance of this report and recommendation.

**I.   BACKGROUND**

Farmer is currently incarcerated in the Ouachita River Correctional Unit of the ADC. Following a jury trial held on September 11-14, 2017, in the Benton County Circuit Court, Farmer was found guilty of the crimes of aggravated robbery, aggravated residential burglary, terroristic threatening, and domestic battery in the third degree. (ECF No. 8-2 at 203); *State v. Farmer*, CR-2016-0031-2. He was acquitted of the charge of aggravated assault on a family/household member. *Id.* at 205. On September 18, 2017, the judgment of conviction was entered. *Id.* at 203. Farmer was sentenced to ten years imprisonment in the ADC for aggravated residential burglary, twenty-two years imprisonment in the ADC for aggravated robbery, six years of

1

imprisonment in the ADC for terroristic threatening, and one-year in the Benton County Jail for third-degree domestic battery. (ECF No. 8-2 at 214). Farmer was also assessed court fees in the amount of $420. *Id.* at 203 & 206. An amended sentencing order was entered on September 21, 2017. *Id.* at 210. The amended sentencing order provided that Farmer should have no contact with Darcy Fisher. *Id.* at 213.

### A. Facts of the Crimes

During the relevant time period, Farmer was in an on-and-off tumultuous relationship with Darcy Fisher ("Fisher"). (ECF No. 8-5 at 122-126). On December 21, 2015, an incident report form was completed by Officer John Redden. (ECF No. 1 at 23); (ECF No. 8-3 at 128). Farmer reported that he had been burglarized by Fisher. (ECF No. 1 at 23). He reported missing a Glock 17, 9 mm pistol. *Id.* at 24. Farmer initially indicated that he did not want to pursue criminal charges against Fisher but just wanted his property back. *Id.* at 26. However, on April 8, 2016, Farmer indicated he did want to pursue charges against Fisher for the incident. *Id.* at 29. Farmer also reported that he had determined that his AR-15 with scope and his United States Marine Corps issued chest rig had been taken. *Id.* In the meantime, as discussed below, these items had been recovered by Gentry, Arkansas, police officers and were being held at the Gentry Police Department pending proof of ownership by Farmer. *Id.*

On January 4, 2016, Farmer and Fisher exchanged hundreds of text messages beginning at 8:58 a.m. and continuing until 10:23 a.m. (ECF No. 8-2 at 126-167). Farmer made various threats against Fisher including the following: "If you mouth my kid I will shove my thumb through your eye;" "I will bust your f------ teeth out today;" "I'm going to smash another phone . . . as well as your face;" "I'm going to hurt you today;" "I'm going to kill you;" "You[r] face is

going to be f----- up again;" "Bringing my AR[-15] also . . . I'm ready to die, are you;" "You don't realize how addicting beating the f--- out of you has become. I love it. Almost as good as killing;" "They are going to call me the butcher;" "I'm going to have your tongue in a jar on my shelf;" "Yeah I've never kicked a door in remember;" and "Call the cops. I need a challenge. Then there will be blood everywhere." *Id.* at 167-239. Farmer also indicated that he was coming to Fisher's house to get his "money or equivalent." *Id.* at 145. Fisher, using an app, created a PDF of the text messages and added the time, the phone number, and indicated whose phone sent the text messages. *Id.* at 128. At the criminal trial, the text messages were admitted, over Farmer's objection, as State's Exhibit 20. *Id.* at 128-129. Although she testified several times that the text messages accurately reflected her conversation with Farmer, on cross-examination, Fisher admitted that she had deleted some text messages that placed her in a bad light. *Id.* at 128 & 211; (ECF No. 8-6 at 52 & 83).

Farmer also left a series of eight voicemails for Fisher. (ECF No. 8-5 at 129-142)(State's Exhibits 21-28 & 46). Fisher testified she took her phone to the Gentry Police Department and they made a recording of the voicemails. *Id.* at 129 & 185-186. The voicemails were admitted during the state criminal trial over Farmer's objections. *Id.* at 128-129 & 132-142. The phone was not available for a forensic evaluation, because Fisher had returned the phone to its owner. *Id.* at 198.

Fisher testified that she did not take the threats seriously because Farmer had threatened her before, and nothing had ever happened. (ECF No. 8-5 at 142-143). In fact, Fisher indicated she laid down and took a nap. *Id.* at 142. Fisher testified that she woke from the nap to the sound of beating on her door. *Id.* at 144. Fisher testified Farmer kicked the door three times and it then

burst open.  *Id.*   She indicated Farmer came into her house wearing a flak jacket and carrying his assault rifle ("AR-15").  *Id.*   Farmer then grabbed her and proceeded to beat her.  *Id.*   Fisher testified that he hit her mostly on her knees and quads and in her abdomen area and groin area.  *Id.* at 145.   He also held a knife to her face and told her he was going to disfigure her.  *Id.* at 146.  Fisher testified "[h]e flung me around quite a bit, pulled a lot of my hair, slapped me.   He cupped his hands and repeatedly hit me over each of my ears."  *Id.* at 147.

Fisher testified that Farmer told her that she was going to die; her kids could die with her; he was going to take her belongings because she owed him money; and that she would never walk or be able to work out in a gym again.  (ECF No. 8-5 at 144-146).   Fisher stated that when Farmer went to get her AR-15, she ran across the street and beat on her neighbor's door to ask him to call 911.  *Id.* at 148.   Fisher then noticed Farmer put her AR-15 in the back of his car and that he had her television sitting in the doorway.  *Id.* at 149.   Fisher took her AR-15 out of the backseat of his car.  *Id.*   Farmer then ran over and "jerked it out of [Fisher's] hand, flung it in the yard and then put [Fisher] in a chokehold" and dragged her back in the house.  *Id.*   Farmer then stated he was going to kill her and started hitting her again.  *Id.*   Farmer stopped when he could hear the police sirens.  *Id.*   Farmer let her go at that point and Fisher ran out of the house.  *Id.* at 150.  Photographs were introduced showing Fisher had bruising, discoloration, and scratches around her left eye, her left buttock, her right leg, her cheeks, her forehead, behind her right ear, on both arms, on both wrists, on the left side of her torso, and the left side of her neck  *Id.* at 153-168.   She was seen by emergency medical personnel at the scene and went to the hospital the following day.  *Id.* at 168-169.   In addition to the bruising, redness, and scratching, she was diagnosed with a concussion.  *Id.* at 169.

4

Officer Jorge Reyes, Officer Rick Lane, Sergeant Clay Stewart, and Sergeant Dale Denver responded to a physical disturbance in progress call. (ECF No. 8-2 at 17). The officers were advised that the disturbance was between a male and female and that the male had an assault rifle. *Id.* Upon arrival, Fisher was observed running from the house, holding her stomach, crying, and appearing to be in pain. *Id.* Fisher identified her ex-boyfriend, Farmer, as the other party involved and indicated he was in the house. *Id.* A neighbor also advised that he saw the man enter the home with an assault rifle. *Id.*

Farmer advised the officers that he was at Fisher's to pick-up property belonging to him and that she had agreed he could come. (ECF No. 8-2 at 17). Farmer said that after he arrived, they began to argue, at which point, Fisher became aggressive towards him, hitting and scratching him, and he merely pushed her away. *Id.* Farmer denied getting physical with Fisher. *Id.* The officers did not notice any markings on Farmer, and he could not locate any when asked. *Id.* Farmer also reported that Fisher had gone into his residence in Missouri and taken some of his guns which he was trying to get back. *Id.* When asked about the broken door frame, Farmer indicated it must have happened when he fell into the door. *Id.* at 17-18.

Fisher reported to Officer Lane that Farmer had forced his way into the residence and began to hit her. (ECF No. 8-2 at 18). She indicated Farmer had taken her assault rifle and a flat screen television and put them in his vehicle. *Id.* The neighbor who had placed the 911 call was identified as Jody Keigley. *Id.* Keigley explained that Fisher had come to his door asking him to call 911 because her ex-boyfriend had been beating her. *Id.* At this point, Farmer came over and grabbed Fisher by "the arm and yelled, 'Get your ass in the house!' while pushing her towards her house. [Farmer] then got an assault rifle from inside his vehicle and headed back inside the

5

residence with her." *Id.*

When Fisher advised Farmer that the police were on the way, she reported that he "picked [her] up off the floor by her hair, flung her around, and then slammed her into the floor. (ECF No. 8-2 at 18). Fisher indicated Farmer held a knife to her face and told her that he would disfigure her. *Id.* He also threatened her and indicated that her children, who would be home soon, could die with her. *Id.* Officer Reyes took photographs of Fisher's injuries that were subsequently introduced at the trial. *Id.* Note was also made that the wooden frame on the inside of the front door was damaged and had separated from the wall. *Id.*

Farmer was arrested and charged with aggravated robbery, aggravated residential burglary, terroristic threatening, domestic battery in the third degree, and aggravated assault on family/household member. (ECF No. 8-2 at 10). Bond was set at $25,000, cash or corporate surety bond, with a special condition that Farmer have a no contact order with Fisher. *Id.* A no contact order was also entered on January 6, 2016. *Id.* at 15 & 29. The order additionally provided that Farmer was not to possess any firearms or ammunition, alcohol, illegal controlled substances, or any other controlled substance for which he did not have a prescription. *Id.*

### B. Trial Level

#### (1). The Text Messages

With respect to the text messages, Farmer filed a pretrial motion to exclude the text messages. (ECF No. 8-2 at 113). Farmer argued that Fisher's credibility was going to be a critical issue in the case. *Id.* Farmer explained that the State wanted to offer a number of text messages allegedly sent by Farmer to Fisher to corroborate portions of Fisher's version of the events and help establish the intent elements necessary to convict Farmer of the charges against

6

him.  *Id.*  Farmer argued the text messages must be excluded from trial because neither the State nor Fisher had produced the phone on which the messages were allegedly received.  *Id.* at 114.  For this reason, Farmer had been unable to perform a forensic examination and verify their authenticity.  *Id.*  The State indicated the phone could not be produced because Fisher had returned it to its owner, who had since died.  *Id.*  Farmer argued he was denied his due process rights and his state and federal constitutional rights to confront and cross-examine the evidence to be used against him.  *Id.*  Farmer argued that the text messages appeared to have been altered.  *Id.*  Farmer also provided information about certain apps that could be used to alter or create text messages.  *Id.* at 119.

The State maintained the text messages were admissible.  (ECF No. 8-2 at 194).  The State asked the court to consider the following points:  the text messages came from a phone number associated with Farmer; the messages referenced numerous details that provided indicia of reliability; the referenced actions were some of the actual actions Farmer took later in the day; Farmer told his mother, Sandra Switzer, that he had been engaged in a "text fight" with Fisher before he went to Fisher's house; and Fisher could lay a foundation for the messages by testifying that the messages accurately reflected the conversation she had with Farmer the morning of the incident.  *Id.* at 194-195.

The text messages, as set forth in State's Exhibit 20, consist of an exchange of 273 messages beginning at 8:58 and ending at 10:23.  (ECF No. 82- at 301-342).  The messages include the use of name-calling and derogatory terms by both parties.  *Id.*  The messages attributable to Farmer contain vulgar language and contain threats of physical violence.  *Id.*

The court denied Farmer's motion to exclude the text messages.  (ECF No. 8-2 at 209).

The court found sufficient indicia of reliability that "Farmer sent the text messages in question to [Fisher] prior to his charged offenses." *Id.* The court further found that "tampering with the phone is an issue of weight and not an issue of admissibility." *Id.*

### (2). The Voicemails

The State did not provide the voicemails as part of the discovery it provided Farmer on February 23, 2016. (ECF No. 8-2 at 208). The State provided the voicemails to Farmer on September 1, 2017, just ten days prior to the scheduled jury trial. *Id.* On September 11, 2017, the day of the scheduled jury trial, Farmer requested a continuance. *Id.* The request was denied even though the State agreed that a continuance would be the proper remedy for its late disclosure of the voicemails. *Id.*; (ECF No. 8-3 at 116). In denying the request, the court noted that Farmer had ten days to review the voicemail evidence and had not brought this discovery irregularity to the attention of the court during the intervening time period. (ECF No. 8-2 at 208); (ECF No. 8-3 at 114 & 117).

### C. Motion for a New Trial

As explained above, following a jury trial, Farmer was found guilty of the crimes of aggravated robbery, aggravated residential burglary, terroristic threatening, and domestic battery in the third degree. (ECF No. 8-2 at 203); *State v. Farmer*, CR-2016-0031-2. He was acquitted of the charge of aggravated assault on a family/household member. *Id.* at 205. On October 13, 2017, Farmer filed a motion for new trial. (ECF No. 8-2 at 214). Farmer argued he was entitled to a new trial because: (1) the text messages provided by Fisher were premised on perjured testimony and not properly authenticated; (2) the voicemails from Fisher's phone were not provided to Farmer until September 1, 2017, which denied him a meaningful opportunity to defend

8

against the evidence; and (3) he was denied the opportunity to present relevant mitigating testimony through his counselor James Childers because Childers refused to turn over Farmer's counseling records to the State in response to a legally deficient Health Insurance Portability and Accountability Act ("HIPAA") authorization submitted by the State. *Id.* at 215.

With respect to the text messages, Farmer asserted that on cross-examination Fisher admitted "she had deleted messages, altered, or otherwise tampered with the messages she had just moments before sworn were accurate, complete, and truthful copies of the text conversation between herself" and Farmer. (ECF No. 8-2 at 216). Farmer maintained the damage had already been done because during direct-examination, the State already read through each and every message with Fisher. *Id.* Farmer's motion to strike the exhibit and for mistrial were denied. *Id.* Farmer maintained that the text messages were inadmissible under both Rules 901 and 403 of the Arkansas Rules of Evidence. *Id.* at 219. Farmer argued he was in effect required to establish the text messages were not authenticated rather than the State being required to authenticate them. *Id.* at 220-221. Allowing the text messages to be read verbatim and remain in evidence, in Farmer's view, compromised the fundamental fairness of the trial. *Id.* at 221. Farmer further maintained that perjured testimony could not be used to prosecute him or to authenticate the State's exhibits. *Id.*

With respect to the voicemails, Farmer contended the late disclosure was a prejudicial discovery violation that denied him a fair trial, as he had inadequate opportunity to investigate the voicemails and to prepare to defend against them. (ECF No. 8-2 at 122). Farmer indicated that the threatening voicemails were allegedly recorded from Fisher's phone with the assistance of police in January 2016. *Id.* at 225. Had he had reasonable notice of the voicemails, Farmer

contended he would have retained an expert to "challenge the authenticity and to testify at trial about the ease with which such messages may be fabricated and/or the impossibility of verifying the messages due to the unavailability of the phone." *Id.* at 226. Farmer pointed out he moved for a continuance, which the State did not object to a continuance, but was denied by the court due to the State's open discovery file and the fact that Farmer did nothing to bring this issue to the court's attention until the day of the scheduled jury trial. *Id.* at 226-227. Farmer was denied any relief. *Id.* at 227. Farmer maintained that "[b]y denying [Farmer's] motion for continuance but still allowing the State to introduce the voice mails, . . . Farmer's trial did not meet the requirements of fundamental fairness imposed by the due process provisions of the Arkansas and United States Constitutions." *Id.* at 229.

Finally, Farmer maintained he was "denied due process when he was not allowed to present relevant mitigating testimony at sentencing concerning counseling he had sought voluntarily after the incident with Ms. Fisher." (ECF No. 8-2 at 229). Farmer indicates he called "James Childers as a non-expert witness to testify concerning the counseling that [he] was receiving, his progress in the counseling program, his character, and his change in disposition as a result of counseling." *Id.* The State objected to Childers testifying because he had not provided the State with counseling records for Farmer. *Id.* The objection was sustained by the court and Childers was "precluded from testifying about anything that was contained in his counseling notes." *Id.* Childers was only allowed to testify to "the bare fact that he had provided counseling" to Farmer. *Id.* Farmer argued that the "State manufactured its own objection by requesting Mr. Farmer's counseling records from Mr. Childers with a woefully deficient records authorization that would have subjected Mr. Childers to a hefty fine and a year-long prison sentence had he actually

10

complied with the State's request." *Id.* at 229-230. Farmer asserted that to be valid, the authorization had to meet the requirements set forth in 45 C.F.R. § 164.508(a)(1). *Id.* at 230. Farmer maintained that he should not have been limited in his ability to present mitigating evidence during sentencing because the State's authorization did not meet HIPPA's requirements. *Id.* at 230; (ECF No. 8-3 at 4)(authorization submitted by the State). Farmer asserted that his constitutional right to present a defense was compromised by the court's ruling. *Id.* at 231.

The motion was denied. (ECF No. 8-3 at 5-6).

### D. Direct Appeal

On November 10, 2017, Farmer appealed his conviction to the Arkansas Court of Appeals, *State v. Farmer*, CR-18-434. (ECF No. 8-3 at 11). Farmer raised two issues on appeal: the circuit court had wrongfully admitted the text messages; and the State withheld the voicemails until it was too late to prepare a meaningful defense. *Id.* The conviction was affirmed on March 6, 2019. *Id.* Farmer sought review from the Arkansas Supreme Court. *Id.* His request was denied on May 23, 2019. *Id.*

## II. DISCUSSION

Pursuant to 28 U.S.C. § 2254(a) the "court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

### A. Grounds Asserted

As grounds for relief in this habeas corpus action, Farmer asserts the following: He was denied a fair trial in violation of the Sixth Amendment to the United States Constitution, in violation of the Arkansas Constitution Art. 2 § 1, and in violation of his right to Due Process and

11

Equal Protection provisions of the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, Farmer asserts he was denied a fair trial when the circuit court:

**(Claim 1)--**admitted into evidence altered text messages and voicemails during Fisher's testimony. (ECF No. 1 at 16-19).

**(Claim 2)--**refused to allow into evidence police reports showing Farmer had accused Fisher of "stealing the very items she testified to petitioner bringing with him to rob her." *Id.* at 19.

The State argues that: (1) Claim 1 is not cognizable in a habeas proceeding because the claim was decided on the basis of state evidentiary law, Ark. R. Evid. 901; further, the State argues that even without admission of the text messages, there remained overwhelming evidence of Farmer's guilt; and (2) Claim 2 is not cognizable in a federal habeas corpus proceeding because it involves a matter of state evidentiary law; further, even if it is cognizable, it is procedurally defaulted; alternatively, the claim fails on the merits.

### B. Claim 1—Text Messages and Voicemail

"A state court's evidentiary ruling is a matter of state law, and we may examine the ruling in a habeas proceeding only to determine whether the asserted error denied due process." *Bailey v. Lockhart*, 46 F.3d 49, 50 (8th Cir. 1995)(citation omitted). "The evidence [is viewed] in the light most favorable to the prosecution and [the court must] decide whether any rational jury could have found, beyond a reasonable doubt, all of the elements of the crime." *Weston v. Dormire*, 272 F.3d 1109, 1111 (8th Cir. 2001)(c*iting Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319.

12

Having reviewed the totality of the evidence, the Court concludes that the admission of the text messages and voicemails was "not so prejudicial that [the] admission fatally infected the trial and deprived [Farmer] of fundamental fairness." *Bailey*, 46 F.3d at 50. Other significant evidence of guilt existed that supports the verdict of the jury: the testimony of Officers Lane and Reyes and Sergeant Stewart, all of whom were dispatched to Fisher's house; testimony of the neighbor, Jody Keigley, that Farmer entered the house with a AR-15; the pictures of Fisher's injuries; the description of Fisher's injuries and the medical records regarding her treatment; the lack of injury to Farmer; the broken door; the testimony of Jeff Parks, a neighbor and part-time firefighter, who assisted in assessing Fisher's injuries; Farmer's admission to his Mother, Sandra Switzer, that he had engaged in a text fight with Fisher and had beaten her up; Fisher's testimony; and Farmer's admission to his ex-wife, Kendall Farmer, that he had beaten Fisher up.[1] Farmer has failed to show the admission of the text messages and voicemails violated due process.

### C. Claim 2—The Police Report by Farmer

Pursuant to 28 U.S.C. § 2254(b)(1)(A), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." The exhaustion concept is based on the principles of comity and provides that "federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act." *Mellon v. Purkett*, 63 F.3d 781, 784 (8th Cir. 1995)(citation omitted). "To satisfy exhaustion requirements, a habeas petitioner who has, on direct appeal, raised a claim that is decided on its merits need not raise it again in a state post-conviction proceeding." *Satter v.*

---

[1] In his reply brief, Farmer raises the admissibility of the testimony of his Mother and ex-wife. This was not raised on appeal. Farmer failed to exhaust his state law remedies on this claim. 28 U.S.C. § 2254(b)(1)(A).

13

*Leapley*, 977 F.2d 1259, 1262 (8th Cir. 1992). "A claim is considered exhausted when the petitioner has afforded the highest state court a fair opportunity to rule on the factual and theoretical substance of his claim." *Ashker v. Leapley*, 5 F.3d 1178, 1179 (8th Cir. 1993).

Farmer did not raise an issue on appeal regarding the Court's refusal to allow him to introduce a police report he had filed in December of 2015 alleging that Fisher stole a Glock from his house. (ECF No. 8-9 at 1-11)(Farmer's Arkansas Court of Appeals brief);(ECF No. 8-12 at 1-16)(Arkansas Court of Appeals Decision, *Farmer v. State*, No. CR-18-434 (Ct. App. March 6, 2019). Farmer failed to exhaust this claim.

Thus, this petition contains both exhausted and unexhausted claims which is referred to as a "mixed" petition. The Supreme Court's decision in *Rose v. Lundy*, 455 U.S. 509 (1982), requires such petitions to be dismissed without prejudice. However, in *Rhines v. Weber*, 544 U.S. 269, 277 (2005), to avoid the harsh application of the Antiterrorism and Effective Death Penalty Act's (AEDPA's) one-year statute of limitations in conjunction with the *Rose* total dismissal rule, the Supreme Court held that a stay and abeyance procedure may be appropriate if a petitioner presents a "mixed" petition.

The dismissal or stay and abeyance procedure may be avoided due to the application of § 2254(b)(2), which allows the Court discretion to deny an unexhausted claim on the merits.[2] *See also Granberry v. Green*, 481 U.S. 129, 135 (1987)(court may deny an unexhausted claim on the merits where it is perfectly clear that the petitioner does not raise a colorable federal claim).[3]

---

[2] The Court, however, cannot grant relief on an unexhausted claim. 28 U.S.C. § 2254(b)(1).

[3] Respondent raises the closely related doctrine of procedural default. Procedural default exists when a petitioner has defaulted his federal claims in state court by failing to meet the state's procedural rules for presenting the claims. *See e.g., Coleman v. Thompson*, 501 U.S. 722, 731 (1991)(Coleman procedurally defaulted his federal claims by filing his notice of appeal from the state trial court three days late). Respondent, however, does not indicate what state procedural rule Farmer failed to comply with. For the reasons stated in the report and recommendation, the Court finds it unnecessary to address this doctrine.

As discussed above, this Court's review of a state evidentiary ruling is limited to determining whether the "asserted error denied due process." *Bailey*, 46 F.3d at 50. While the state trial court declined to allow the admission of the police report itself, Farmer was allowed to introduce the facts underlying the report through the testimony of Jason Sandbothe. (ECF No. 8-6 at 153-156). Sandbothe testified that Fisher was at Farmer's home on December 21, 2015; she refused to leave; when Sandbothe returned to Farmer's house later that evening, items had been thrown all over the place both inside and out; liquids were dumped on Farmer's bed; and there were a "couple of firearms missing and a few other items, such as money and his military items." *Id.* at 156. Sandbothe further testified that one of the missing items was Farmer's AR-15 rifle with a scope. *Id.* at 157. On cross-examination, Sandbothe admitted that the police report made no mention of Farmer's AR-15 being missing but instead referred to a Glock pistol being stolen. *Id.* at 159. Farmer also questioned Fisher about her activities on December 21, 2015. *Id.* at 16-17.

Farmer has failed to show the exclusion of the document itself violated due process. The evidence was not completely excluded. Moreover, nothing suggests that the admission of the document itself would have produced a different verdict. It cannot be said that the state court's ruling rendered Farmer's trial fundamentally unfair. *Weston v. Dormire*, 272 F.3d 1109, 1111 (8th Cir. 2001).

### III. CONCLUSION

Based upon the foregoing, the undersigned hereby recommends that Farmer's Motion to Vacate filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED**.

An appeal may not be taken in this matter unless the Court issues a certificate of

appealability, which shall be issued only if "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §§ 2253(c)(1)(A). A "substantial showing" is a showing that "issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997). Based upon the above analysis of Farmer's § 2254 motion, the undersigned does not believe that there is any basis for the issuance of a certificate of appealability and, therefore, recommends that a certificate of appealability be denied.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 21st day of October 2020.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE